Filed 9/29/25  P. v. Turner CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B335022 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA443533) |
| v. | |
| JACOB TURNER III, | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Los Angeles County.  David V. Herriford, Judge.  Modified and affirmed with directions.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Jacob Turner III appeals the judgment entered following a jury trial in which he was convicted of assault to commit rape during the commission of a first degree burglary (Pen. Code,[1] § 220, subd. (b); count 1), rape of an intoxicated person (§ 261, subd. (a)(3); count 2), and rape of an unconscious person (§ 261, subd. (a)(4); count 3). The jury found true, with respect to counts 2 and 3, the allegation that appellant administered a controlled substance, triazolam, during the commission of the offense. (§ 12022.75, subd. (b)(1).) The trial court found that appellant had suffered four prior serious or violent felony convictions under the Three Strikes law. (§§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i).) The court sentenced appellant to an aggregate term of 30 years to life in state prison, consisting of 25 years to life plus five years on count 2, a concurrent term of life with a minimum term of 21 years on count 1, and a total term of 30 years on count 3, stayed under section 654.

Appellant challenges the judgment on a number of grounds, asserting that: He was prejudiced by the failure to preserve potentially exculpatory evidence; the jury was precluded from considering all relevant evidence relating to toxicology tests; his right to confrontation was violated with respect to testimony relating to toxicology testing; his conviction was invalid under the California Racial Justice Act of 2020 (Racial Justice Act; Stats. 2020, ch. 317, § 1); and the trial court improperly admitted unduly prejudicial evidence of alleged prior sexual misconduct. We reject each of these arguments. We further conclude that the trial court did not abuse its discretion in deciding a *Pitchess*[2] motion. We do agree with appellant, however, that the sentence on count 1, which was ordered to run concurrent to count 2, should instead have been stayed under section 654, and we accordingly modify the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

# FACTUAL BACKGROUND

## The victim's testimony

In December 2014, Beatrice H. (Beatrice) met appellant, who identified himself as Jay Freeman, on an online dating Web site. The two had a first date at a bar, and then planned a second date for February 22, 2015. Beatrice was planning on watching the Oscars at her house in Los Angeles on that night, and appellant "invited himself" to watch them with her.

On the evening of February 22, 2015, appellant arrived at Beatrice's house with two bottles of wine and at least one bottle of liqueur. Over the course of the evening, Beatrice had at least several glasses of red wine and sparkling wine poured by appellant.

As they watched television together, appellant put his hand on Beatrice's leg. She moved it away and said, "We're not doing that." Later, when Beatrice got up to look out the window, appellant came up close behind her, and she could feel that he had an erection. She pushed him away and again told him, "No we're not doing this."

At some point, appellant mixed a drink for Beatrice using the liqueur. Afterward, she remembered being led up the stairs of her house, but she had no memory of anything else that occurred around that time.

Beatrice's next memory was of "sort of coming to while lying on the bed," feeling as if she had "been anesthetized." Appellant was naked and kneeling in front of her on the bed, holding her legs up by her ankles. Beatrice's pants and underwear had been removed. She felt just lucid enough to tell him "No," and that "it hurt," and she noticed a pain in her vagina that she did not have earlier that evening. Beatrice got out of bed, hoping to do something about the pain, but she felt "half not there," like she was "on autopilot." Appellant guided her back to the bed. When she told him that it hurt, he responded, "But I like sex." Beatrice again said, "No."

3

Beatrice's next memory was of appellant telling her he had to leave.  When Beatrice went downstairs, she saw her pants lying on the floor, which confused her because it was something she "never, ever" did.  Later, while she was at work, she felt that something was wrong and went to urgent care, and then was directed to go to a rape center for a rape kit.

At the time of the incident, Beatrice was taking sertraline, a generic antidepressant, which she took daily in the morning.  She was accustomed to drinking wine with dinner.  She had never felt the way she did on the night of the incident simply from drinking alcohol while on the antidepressant.  Instead, the only time she had felt similarly was after being administered total anesthesia for knee operations.

Eventually, after going to the rape center and becoming more aware that something had occurred, Beatrice spoke with the police.  She was directed by a detective to call appellant using a recording device.  Appellant took her call, but said that he did not remember what had happened and that he had too much to drink.

## Sexual assault examination

Nurse practitioner Madelynn Finkelstein conducted the sexual assault examination (referred to as a SART exam) of Beatrice.  The exam followed a state protocol.  Beatrice told Finkelstein that she recalled one act of penetration, one attempted act of penetration, and oral copulation of her genitals.

Finkelstein conducted a genital examination of Beatrice.  She noted that Beatrice had "very significant" cervical injuries.  Her vaginal region had an abrasion and "quite a bit of bruising," was "very, very, very swollen," and was tender.  Additionally, she had a small laceration at the perineum.  Finkelstein stated that Beatrice's injuries were "very severe," and the cervical injuries were "not common at all" and "extremely rare."  She concluded that the injuries could not have been caused by genital herpes, and that it was very unlikely the injuries were caused by consensual sex because "it would be very painful."

4

Prior to the incident, Beatrice had not had sexual intercourse since divorcing her ex-husband several years earlier.

**Lab testing**

A partial DNA profile consistent with appellant's DNA profile was obtained from a vaginal swab taken during Beatrice's SART exam. The partial profile would be expected to occur in approximately one in 3,846 males. DNA evidence obtained from Beatrice's left breast was also consistent with appellant's DNA profile, and would be expected to occur in approximately one in 400 million unrelated individuals.

A urine sample that Beatrice provided during the SART exam was sent to the police department's crime laboratory. The testing showed an elevated level of benzodiazepines, a drug class known for being used in the commission of date rape. Because the police department was unable to specifically test for a type of benzodiazepine, Halcion (triazolam), which is commonly used as a date rape drug, the urine sample was sent to an outside laboratory for testing.

A forensic toxicologist at NMS Labs, Daniel Isenschmid, was responsible for conducting the final review of the testing of Beatrice's urine sample and producing a toxicology report. The sample tested positive for caffeine and for "triazolam metabolites, hydroxytriazolam." The amount of triazolam detected in the sample was consistent with a person taking a single dose approximately six to 12 hours prior to providing the sample.

Isenschmid testified that benzodiazepines are a class of drugs primarily used for antianxiety and "for a sedative, hypnotic sleep use." Benzodiazepines affect a person's ability to recall data and can have an "amnesic effect." Triazolam, which has a brand name of Halcion, is a "very potent benzodiazepine" used primarily for sedation to induce sleep. Combining triazolam with alcohol would make the depressant effects more potent. It was "very rare" to see triazolam in a sample at the laboratory.

5

## Recovery of evidence

Appellant's apartment was searched in February 2016. Police recovered a prescription bottle for triazolam, under the name of appellant, containing 24 triazolam pills.

## Prior, uncharged incidents

Two witnesses who had prior encounters with appellant testified. The first, Carol B. (Carol), was a nurse who met appellant during a 2003 hospital stay. After appellant left the hospital, they made plans to meet at appellant's apartment and then go out on a boat. At the apartment, appellant offered to make Carol a mixed alcoholic drink. As Carol chatted with appellant and finished her drink, she noticed some sediment at the bottom of the glass but assumed it was from a liqueur.

Carol was about halfway through a second drink when she started to feel very sleepy. Her next memory was waking up, feeling "semi-conscious" and "totally confused," and trying to speak, but her tongue felt "very heavy." She very slowly said, "I have to pee." Appellant supported her as she walked to the bathroom.

Carol, who was accustomed to drinking, knew that she was not just feeling drunk and that something was wrong. Appellant handed her underwear to her and chuckled. Carol left the apartment and stumbled to her car. She drove toward her home, swerving and nodding off along the way, and rear-ending another vehicle one block from her destination. She later realized that she could not account for approximately five hours of time, beginning from when she drank part of the second drink.

The next morning, Carol went to work and then to a medical clinic. She had a sexual assault exam, during which blood and urine samples were taken. The exam showed lacerations inside her vagina.

The second witness, Meta K. (Meta), went on a date with appellant in February 2004, their third date together. After dinner, appellant went with Meta to her home, bringing liquor to make cocktails. Appellant prepared a cocktail for Meta and encouraged her

6

to drink it, which she did.  Her next memory was of waking up the next morning, wearing different clothes.  Her clothes from the night before were scattered around the room.

Appellant was still at Meta's home in the morning, against her wishes.  When she asked him what happened, he responded, "We had intercourse," and "We had oral [sex]."  When Meta responded, "I didn't okay that," and "I didn't ask you to stay," appellant replied, "It's okay," and asked for a washcloth.  Meta knew that "something was not right" and she felt ashamed.  She repeatedly asked appellant how it happened and why he did it, and repeated that she did not consent to a sexual encounter.  He again told her, "It's okay," and said he had to leave.

That incident was the first time that Meta had felt the way she did, losing her memory.  It felt different from being really drunk.  A few days afterward, Meta got a sexual assault exam at a hospital.

**Defense evidence**

The parties stipulated that testing of Beatrice's clothing did not show semen or male DNA, and that blood was not found on her underwear.  They further stipulated that two shot glasses from Beatrice's house were tested, and no benzodiazepine residue was found.

An independent DNA consultant, Mehul Anjaria, testified for the defense.  He testified that the DNA profile obtained from the vaginal swab of Beatrice would be found in about one in 3,846 males.  Given the population of Los Angeles County, approximately 1,300 males in the county would be expected to match the DNA profile.  While appellant could not be ruled out as the donor, many other males could not be ruled out as well.

Cari Caruso, a registered nurse and sexual assault nurse examiner, also testified for the defense.  She reviewed the SART exam performed by Finkelstein.  Contrary to Finkelstein's opinion, Caruso concluded that redness shown in photographs of Beatrice's vaginal area was caused by an outbreak of herpes.  Caruso further testified that it was uncommon for the cervix to be injured from a sexual encounter.

7

## DISCUSSION

## I.     Failure to Preserve Evidence

Appellant contends that his rights to due process were violated under *California v. Trombetta* (1984) 467 U.S. 479 [104 S.Ct. 2528, 81 L.Ed.2d 413] (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 [109 S.Ct. 333, 109 L.Ed.2d 281] (*Youngblood*) because the police failed to preserve exonerating evidence.  Specifically, appellant claims that he was prejudiced by the failure to preserve (1) the recording of the pretext call placed by Beatrice to appellant after the incident, and (2) Beatrice's urine sample so that it could be provided to the defense prior to trial.

### A.     *Background*

#### 1.     *Motion to dismiss*

Prior to trial, appellant filed a motion to dismiss the information based on the alleged failure to preserve evidence, including the recording of the pretext call and the urine sample.

A hearing on the motion was held in December 2018.  Two witnesses, Los Angeles Police Department Sergeant Tracy Wolfe and Detective Brent Hopkins, were called by the prosecution.  Wolfe testified that she was the initial investigating officer for the incident and that she interviewed Beatrice in May 2015.  Based on the interview, Wolfe directed Beatrice to make a pretext phone call to appellant using a recording device that Wolfe provided.

Beatrice recorded her conversation with appellant, and Wolfe then saved the conversation to a disc, which she put into the case file.  Wolfe additionally summarized the conversation in her report on the case.  Wolfe, who was promoted to a different position shortly after the pretext phone call was made, did not know what happened to the disc after she placed it in the case file.

Hopkins took over the case after Wolfe was promoted.  He reviewed the case file, but could not find the disc containing the recording of the phone call.

8

Hopkins was in charge of submitting Beatrice's urine sample to NMS Labs, which was located out of state. NMS Labs provided a report based on its testing. The second page of the NMS Labs report contained a paragraph with instructions on maintaining the urine sample, stating that the lab would destroy the sample unless the client affirmatively requested otherwise. Hopkins testified that he did not recall reading the paragraph, that he did not realize the sample would be destroyed, and that he did not know he had to instruct the lab to maintain the sample, stating, "It was an oversight on my part."

At the close of the hearing, the court found, based on the testimony, that there was no "bad faith" connected with the loss of the disc containing the recording of the pretext call. The court also noted that there was a written summary of what was said in the call. As for the loss of the urine sample, the court found that Hopkins "was being direct and honest" when he testified that failing to request preservation was an oversight. The court again found no bad faith in connection with the destruction of the sample. Moreover, the court found that the sample was inculpatory, not exculpatory. The court accordingly denied the motion to dismiss.

2.    *Later proceedings*

At the initiation of the trial, appellant requested that evidence relating to the pretext call and the urine sample be excluded or limited in use. As for the pretext call, the court noted that it would be "inappropriate" to allow an officer to opine as to how appellant sounded on the call, and stated that the defense could raise the fact that the recording no longer existed. The court further found that the defense could inquire into the circumstances of what happened with the urine sample and why it was not available for further testing.

Later, during the middle of trial, the prosecutor stated that Detective Hopkins, while going through the case file, discovered that a "split" urine sample had been sent to NMS Labs, and that there was a remaining portion of the sample still booked into evidence that could be

9

tested by the defense. Appellant (through counsel) immediately moved for a mistrial, arguing that the defense would not have time to conduct testing on the sample as they were already in the middle of trial. The court denied the mistrial request, but found that testing of the sample may provide grounds for a new trial motion in the event of a conviction.

**B.** *Analysis*

Appellant contends that the lost recording and apparently lost urine sample resulted in prejudicial violations of his due process rights under *Trombetta* and *Youngblood*. We review the trial court's denials of appellant's dismissal motions for substantial evidence. (*People v. Duff* (2014) 58 Cal.4th 527, 549.)

Under *Trombetta*, the state's failure to preserve evidence may violate the defendant's due process rights. (*People v. Lucas* (2014) 60 Cal.4th 153, 221 (*Lucas*), disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) *Trombetta* and *Youngblood* set out the requirements for a defendant to demonstrate a prejudicial due process violation in the event of lost evidence. (*Lucas*, at p. 221; *People v. Carrasco* (2014) 59 Cal.4th 924, 961.) If the evidence has " 'an exculpatory value that was apparent before [it] was destroyed,' " and is " 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means,' " then its destruction violates due process. (*Lucas,* at p. 221, citing *Trombetta, supra*, 467 U.S. at p. 489.) If the evidence, however, is merely " 'potentially useful' " to the defense and does not have apparent exculpatory value, its destruction violates due process only if the defendant can show that the police acted in " 'bad faith.' " (*Lucas,* at pp. 221–222, citing *Youngblood, supra*, 488 U.S. at pp. 57–58; see also *Carrasco* at p. 961.)

The recording of the pretext phone call had no apparent exculpatory value. (See *People v. Thomas* (2012) 54 Cal.4th 908, 929 [speculation about what recording might have revealed is insufficient to establish due process violation].) As Beatrice testified at trial,

appellant merely said that he had too much to drink and did not remember what had happened.  Appellant contends that the conversation was exculpatory because he did not specifically admit drugging or raping Beatrice.  Having too much to drink and not remembering are not denials, however.  Even when appellant's words are taken at face value, he still could have drugged and raped Beatrice.

At most, the recording of the conversation might have been potentially useful to the defense.  (See *People v. Alvarez* (2014) 229 Cal.App.4th 761, 775–779 [finding destroyed surveillance video which might have shown defendants' non-involvement was potentially useful].)  Appellant's motion to dismiss, however, was properly denied based on the trial court's finding of no "bad faith" in the loss of the disc containing the recording as the investigation transitioned from Wolfe to Hopkins.  The court heard testimony from both officers and was in the best position to judge their credibility.  Given the record, we cannot say that the trial court's denial of the motion to dismiss for the loss of the recording was unsupported by substantial evidence.[3]

Turning to the urine sample, the trial court correctly found that the sample was inculpatory, not exculpatory.  The known date rape drug specifically tested for, triazolam, was detected in the sample.

---

[3] Appellant further argues that the jury should have been instructed that the loss of evidence adversely impacted his defense.  Appellant did not request such an instruction and thus forfeited this claim.  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1233.)  Appellant also complains that, during her testimony regarding the pretext call, Beatrice stated, as "supposition," that "it seemed to" her that appellant "had done this before and knew not to fall to that trap."  Appellant's trial counsel objected to this portion of the testimony and the trial court sustained the objection and struck the testimony.  Appellant, who argues on appeal that sanctions were warranted, does not claim that the trial court erred in striking the testimony or explain what more it should have done absent further request from counsel.

11

Appellant's contention that he might have found exonerating evidence if he were able to test the sample prior to trial is pure speculation.

Again, at most, the urine sample might have been potentially useful. Even if so, however, appellant is unable to establish a due process violation. " 'The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." [Citation.] In such case, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." ' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1299–1300; see also *Youngblood, supra,* 488 U.S. at p. 58.) The trial court, in determining that no bad faith was present, specifically found that Hopkins's testimony that he unintentionally failed to request preservation of the sample was "direct and honest." Nor was any bad faith apparent in the later recovery of the "split" urine sample, which was provided to the defense. The trial court's denials of appellant's motions to dismiss were thus supported by substantial evidence, and appellant is unable to establish a due process violation.

## II.     Consideration of Testing Evidence

Appellant argues that, based on the prosecution's midtrial discovery of the remaining urine sample, the trial court was obligated to grant either his motion for mistrial or later new trial motion. Appellant contends that because, at the time of trial, only the prosecution had tested the urine sample, the jury was left without a complete picture of what defense testing might have revealed, and that he was accordingly deprived of his right to present a complete defense. He further contends that the jury's finding that appellant administered a controlled substance during the commission of the offense was based on an unfairly limited scope of toxicology evidence and cannot be affirmed.

12

**A.    *Background***

As explained above, during the middle of trial, the remaining portion of the "split" urine sample was located.  The trial court denied appellant's mistrial request, but noted that the delayed discovery of the sample could be raised in a new trial motion in the event of a conviction.

Following the jury's verdicts, the trial court continued sentencing to allow time for the defense to test the urine sample and file appropriate motions.  The court appointed a forensic laboratory, at defense request, to test the remaining sample, and the sample was provided by the defense to the lab for testing.  Following testing, appellant filed a motion for new trial, making several claims, including that the prosecution committed misconduct in failing to produce the urine sample until midtrial.

The motion for new trial discussed the defense's posttrial testing of the urine sample in a roundabout and cagey manner.  The motion, and an accompanying declaration by trial counsel, focused on drugs other than benzodiazepines.  In fact, no mention of testing by the defense for the drug specifically referenced in the verdict form, triazolam (or Halcion), was made in the motion for new trial or declaration, nor was testing for the general class of drug benzodiazepines.  Based on the contents of the motion and declaration, it appears that the lab may have either been instructed by the defense not to test for benzodiazepines, including triazolam, or the defense wished not to reveal the results of such testing.  Either way, the motion in no way tended to establish that the positive results for benzodiazepines and triazolam presented during trial were erroneous.

The trial court, after hearing argument, denied the motion for new trial.  The court noted that a report on defendant's testing of the sample did not "mention anything about benzodiazepine.  It doesn't even address that."

13

**B.** *Analysis*

Appellant contends that the trial court committed reversible error because it denied appellant "the right to a jury trial on the factual discrepancy between the results of the toxicology testing." Appellant argues that only the trial court, in posttrial proceedings, was presented with a full picture of toxicology results and that, in denying the motion for new trial, the court (rather than the jury) became the final decision-maker with respect to the allegation that appellant administered a controlled substance during the commission of an offense. Appellant asserts that this result constituted error under the rule of *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435] that a criminal defendant is entitled to " 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (*Apprendi*, at p. 477; see also *People v. Lynch* (2024) 16 Cal.5th 730, 766 [defendant has right to jury trial with respect to sentencing factors].)

Missing from appellant's argument is an honest discussion of any discrepancy between the results of the toxicology testing. As noted, appellant, though given the chance, apparently did not have the urine sample tested for benzodiazepines, including triazolam, or at least did not reveal those results to the court. Nevertheless, appellant's opening brief on appeal muddies the waters by stating that appellant's "post trial testing of the urine did not detect benzodiazepine." This prompts the question: If the defense did not test for benzodiazepine, why would it be detected? The argument is misleading.

Contrary to appellant's argument, the jury was presented with all of the evidence in the record relating to testing for benzodiazepines and triazolam. The jury was not prevented from considering appellant's evidence on the issue as claimed because such evidence did not exist, even after appellant was given the opportunity to test the urine sample. Sufficient evidence—indeed, all apparent existent evidence—was presented to the jury, allowing it to make an informed

14

decision on the question of whether appellant administered a controlled substance during the commission of an offense. Appellant's counterargument rings hollow.

In a related argument, appellant asserts that his own testing revealed the presence of sertraline, the generic antidepressant, in Beatrice's urine, while the prosecution's testing did not. Appellant argues that, if these test results were available to him at the time of trial, he could have cross-examined the prosecution's expert witness on the issue of whether mixing sertraline with alcohol could have caused the same effect as a benzodiazepine.

Again, appellant's argument is belied by the record. Appellant's motion for new trial stated that the defense expert "was unable to get a measurable value for the sertraline" and "must report it as a negative for the drug." Thus, there was no apparent discrepancy in testing because neither testing facility detected a positive measurable value of sertraline. In any event, Beatrice herself testified that she took sertraline every morning, so the defense was not unaware of the possible presence of sertraline. In fact, the record shows that the defense did cross-examine the prosecution's expert about the interaction of sertraline and alcohol, and the expert responded, "It's not going to have additive effects in the way that it would with triazolam." Appellant thus fails to demonstrate that his trial—including the jury's finding that appellant administered a controlled substance—was impacted in any substantive manner by the delayed discovery of the urine sample.

## III. Expert Testimony

Appellant next contends that the testimony of the NMS Labs forensic toxicologist Isenschmid violated his right of confrontation because Isenschmid conveyed the results of the toxicology tests but did not actually conduct the testing himself. We conclude that appellant has forfeited this argument by not objecting to Isenschmid's testimony at trial.

## A.    *Background*

As noted above, Isenschmid conducted the final review of the testing of Beatrice's urine sample and produced a toxicology report.  He testified that the sample tested positive for "triazolam metabolites, hydroxytriazolam."

Isenschmid explained his role at NMS Labs as follows:  He reviewed data but did not conduct analysis, meaning that he reviewed the case work of others who did the testing.  Isenschmid's responsibilities were "doing the final review after the analysts have done their work and they've been reviewed in the laboratory by a reviewer and a secondary reviewer for the individual tests," and then to "do a review of the final test of all the different tests on a given case."

In this specific case, Isenschmid prepared and signed a four-page report, which noted positive findings for caffeine and triazolam.  Isenschmid testified that his report was based on a "litigation package" of approximately 1,300 pages that documented all of the analytical work and data produced by NMS Labs, including controls used and chain of custody, with respect to the urine sample.  Isenschmid's four-page report, as well as a three-page chain-of-custody report—documenting the NMS Labs analysts that tested the sample and the primary and secondary reviewers—were admitted into evidence without objection.  Neither side requested that the litigation package be introduced into evidence.

Among other additional topics, Isenschmid testified regarding the controls used by NMS Labs to prevent contamination of the urine sample and to assure that testing results were accurate.  He additionally explained the process for testing for triazolam in this case, including how an initial screening tested positive, and how two confirmatory tests were conducted.

## B.    *Analysis*

The Sixth Amendment's confrontation clause guarantees that " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to

be confronted with the witnesses against him.' " (*Crawford v. Washington* (2004) 541 U.S. 36, 38 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*).) The confrontation clause has traditionally barred "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53–54.)

"In operation, the Clause protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom." (*Smith v. Arizona* (2024) 602 U.S. 779, 783–784 [144 S.Ct. 1785, 219 L.Ed.2d 420] (*Smith*).) This limitation "applies in full to forensic evidence. So a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." (*Id.* at p. 783.)

The confrontation clause prohibits only " 'testimonial hearsay.' " (*Smith, supra,* 602 U.S. at p. 784.) The prohibition thus rests on two separate qualifications—that the subject statement is testimonial, and that it is hearsay. (*Ibid.*)

In *Smith*, the United States Supreme Court examined the application of confrontation clause principles to the testimony of an expert witness "restat[ing] an absent lab analyst's factual assertions to support his own opinion testimony." (*Smith, supra,* 602 U.S. at p. 783.) Addressing the confrontation clause's hearsay requirement, the court held: "When an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." (*Ibid.*) *Smith*, however, only "briefly address[ed]" but did "not resolve" the issue of whether such statements met the second condition of being testimonial. (*Ibid.*)

"[T]o be testimonial the out-of-court statement must have been made with some degree of formality or solemnity." (*People v. Lopez* (2012) 55 Cal.4th 569, 581 (*Lopez*), citing *Crawford, supra,* 541 U.S. at

17

p. 51; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310 [129 S.Ct. 2527, 174 L.Ed.2d 314] (*Melendez-Diaz*); and *Bullcoming v. New Mexico* (2011) 564 U.S. 647; 665 [131 S.Ct. 2705, 180 L.Ed.2d. 610].) Further, "the primary purpose of the statement must 'pertain[] in some fashion to a criminal prosecution.' " (*People v. Leon* (2015) 61 Cal.4th 569, 603.) A hearsay statement is generally testimonial if it is "made 'with a primary purpose of creating an out-of-court substitute for trial testimony.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 168.)

A " 'certificate[] of analysis' "—a sworn affidavit by a forensic analyst laying out forensic results that is "functionally identical to live, in-court testimony"—is testimonial. (*Melendez-Diaz, supra,* 557 U.S. 305, 308, 310–311.) But our Supreme Court has held that notations in a laboratory report made by a laboratory analyst or assistant who enters information relating to forensic analysis is "not prepared with the formality required by the high court for testimonial statements." (*Lopez, supra*, 55 Cal.4th at p. 584.) Although the laboratory analyst's and assistant's initials appeared with the report notations in *Lopez*, the report lacked the formality of the certificates " 'sworn to before a notary' . . . by the testing analysts" in *Melendez-Diaz, supra*, 557 U.S. at page 308, or "the laboratory analyst's certificate regarding the result of his analysis [that] was " ' "formalized" in a signed document' " in *Bullcoming, supra,* 564 U.S. at page 665. (*Lopez* at pp. 584–585.)

Appellant contends that his right to confrontation was violated in this case because Isenschmid's testimony was based on other analysts' testing of the urine sample and reporting. We do not fully reach the issue, however, because appellant forfeited this contention. At trial, no objection—including a confrontation clause objection—was made to any of Isenschmid's testimony regarding the toxicology testing and results or the related exhibits. " 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to

18

determine it.' " (*United States v. Olano* (1993) 507 U.S. 725, 731 [113 S.Ct. 1770, 123 L.Ed.2d 508].)  A confrontation clause claim that is not raised at trial by objection is forfeited on appeal (except in limited circumstances not applying here).[4]  (*People v. Arredondo* (2019) 8 Cal.5th 694, 710 (*Arredondo)*; *People v. Tafoya* (2007) 42 Cal.4th 147, 166.)

"The reason for this rule is to allow the trial court to correct its errors and 'to prevent gamesmanship by the defense.' " (*Arredondo, supra,* 8 Cal.5th at p. 710.)  "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' " (*People v. Partida* (2005) 37 Cal.4th 428, 434.)  Had the defense in this case timely objected, and if the objection had merit, the prosecution could have been afforded the opportunity to " 'lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*Ibid.*).  Since the defense failed to object to Isenschmid's testimony on confrontation clause grounds, the prosecution was not given the opportunity for correction as warranted, and appellant may not raise the claim here.[5]

---

[4] Appellant contends he preserved the claim by making a version of it in a posttrial motion for new trial.  He is incorrect.  (See *People v. Williams* (1997) 16 Cal.4th 153, 254 [purpose of objection at trial is to allow correction of error and mitigate prejudice; raising issue in new trial motion is not timely].)

[5] We do not address appellant's cursory contention, first made in his reply brief, that his attorney's failure to object constituted ineffective assistance of counsel.  (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [claim of ineffective assistance raised for first time in reply brief forfeited].)

In any event, given the record before this court, appellant does not establish a confrontation clause violation. Isenschmid's testimony at trial was based on his own report, which he created in doing a "final review" of the data. No objection was made to the use of the report or its introduction into evidence. Since the report was admitted into evidence, appellant is unable to show that Isenschmid's testimony was grounded on an improper consideration of hearsay. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 686 [expert may not relate as true case-specific facts relying on hearsay unless "independently proven by competent evidence"].)

Furthermore, even if we were to assume that the contents of the litigation package that Isenschmid reviewed constituted hearsay and that he exclusively relied on the package in formulating his opinion, given the scant description of what was contained in the litigation package and any formality (or informality) it possessed, we do not determine whether the document was testimonial. Ultimately, the record before us provides no basis to find a confrontation clause violation.

## IV. Racial Justice Act

Appellant's Racial Justice Act claim is based on evidence elicited by his own trial attorney. Specifically, appellant argues that defense counsel's cross-examination of the victim, Beatrice, referring to asserted racially discriminatory statements, as well as a videotaped police interview of Beatrice that was played for the jury by defense counsel, violated the Racial Justice Act.

During cross-examination of Beatrice, referencing an interview conducted by Detective Hopkins following the incident, defense counsel questioned Beatrice as to whether she told Hopkins that appellant (who is African-American) dates only white women, and whether she said that appellant was "getting revenge on white women." Beatrice responded that she did not recall, though did not deny, making either statement.

20

Later, during the cross-examination of Hopkins, defense counsel played for the jury the video-recording of the interview. In the interview, Beatrice recounted how, in conversation, she mentioned to appellant that they did not have much in common, and appellant (according to Beatrice) responded that he "only dates white women." Beatrice continued: "[T]hen later on I was thinking you know that maybe . . . he's got this revenge fix on white women or who knows, but I don't know if this is meaningful at all, I just wanted to put it out there."

Appellant argues that the comments that appellant dated only white women and that he may have a "revenge fix" on white women infected the trial with racial bias and are addressable under the Racial Justice Act. The Racial Justice Act "sets forth four categories of conduct, any of which, if proved, is enough to 'establish' a violation of section 745, subdivision (a)." (*Young v. Superior Court of Solano County* (2022) 79 Cal.App.5th 138, 147.) Appellant focuses on two of these categories, section 745, subdivision (a)(1), under which a violation occurs if "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin," and subdivision (a)(2), which applies when "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." Section 745, subdivision (h)(4) defines " '[r]acially discriminatory language' " as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language." No violation occurs under section 745, subdivision (a)(2), however, "if the

21

person speaking is relating language used by another that is relevant to the case." (*Ibid.*)

The People contend that appellant is estopped from raising his Racial Justice Act claim on appeal because he, through his attorney, introduced the challenged evidence. We agree. A defendant who " 'is responsible for the introduction of . . . evidence . . . cannot complain on appeal that its admission was error.' " (*People v. Ramos* (1997) 15 Cal.4th 1133, 1168; see also *People v. Williams* (1988) 44 Cal.3d 883, 912 ["It is axiomatic that a party who himself offers inadmissible evidence is estopped to assert error in regard thereto"].) It is undisputed that the challenged evidence was only introduced by the defense, and there is no suggestion that it would have been introduced by the prosecution. Appellant, who presumably intended to attack the credibility of Beatrice with the evidence, cannot now leverage his own introduction of the evidence to create a Racial Justice Act violation on appeal.[6] (See *People v. Midell* (Aug. 28, 2025, A168758) ___Cal.App.5th___ [2025 Cal.App. Lexis 545] [defendant procedurally barred from raising Racial Justice Act claim on appeal because defense attorney's comparisons of client to an animal were tactical].) A contrary holding would allow defendants at trial to manufacture a potential ground for reversal on appeal simply by introducing evidence arguably subject to the Racial Justice Act.

In any event, even if the issue were cognizable, appellant does not demonstrate a violation of the Racial Justice Act. The challenged evidence consisted of the statements made by Beatrice. Neither subdivision (a)(1) nor subdivision (a)(2) of section 745, however, applies to statements made at trial by a lay witness such as Beatrice; instead, these subdivisions cover violations by "[t]he judge, an attorney in the

---

[6] Appellant does not explain how this would work logistically, including whether his attorney should have objected to his own line of questioning.

case, a law enforcement officer involved in the case, an expert witness, or juror." (§ 745, subds. (a)(1), (2).)  Furthermore, to the extent that appellant contends his own attorney's introduction of the evidence violated the statute, the qualifying language of section 745, subdivision (a)(2) counsels otherwise, since appellant's attorney was merely "relating language used by" Beatrice that the defense deemed "relevant to the case." (*Ibid.*)

## V.     Prior Uncharged Acts of Sexual Misconduct

Appellant additionally argues that the trial court abused its discretion by admitting evidence of prior uncharged acts of sexual misconduct, namely the testimony of Carol B. and Meta K., under Evidence Code sections 1108 and 352.

Prior to trial, the defense objected to the prosecution's request to call Carol and Meta, arguing that the prejudicial value of their testimony would far outweigh the probative value, and that the jury would be led to believe that appellant was predisposed to commit similar acts.  The trial court overruled the objection, observing, "that's always a concern with 1108 evidence," noting that a corresponding instruction would be given to the jury, and concluding that the evidence would be "extremely probative" and outweigh the prejudicial value.

We review the trial court's admission of the evidence for an abuse of discretion.  (*People v. Cordova* (2015) 62 Cal.4th 104, 132 (*Cordova*).) "Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion.  (Evid. Code, § 1101, subd. (a).)" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095 (*McCurdy*).)  Evidence Code section 1101, subdivision (b), however, provides an exception for admission of such evidence for the limited purpose of establishing identity, common plan, or intent " 'if the charged and uncharged crimes are sufficiently similar to support a rational inference' on these issues." (*People v. Edwards* (2013) 57 Cal.4th 658, 711.)

23

Evidence Code section 1108 operates as a broader exception by allowing the admission of evidence of a defendant's uncharged sexual offenses to prove a propensity to commit a charged sexual offense, subject to the trial court's discretion to exclude the evidence under section 352. (*McCurdy, supra,* 59 Cal.4th at p. 1095.) "[T]he clear purpose of [Evidence Code] section 1108 is to permit the jury's consideration of evidence of a defendant's propensity to commit sexual offenses . . . . '[C]ase law clearly shows that evidence that [a defendant] committed other sex offenses is at least circumstantially *relevant* to the issue of his disposition or propensity to commit these offenses.' " (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1164.) Under Evidence Code section 1108, evidence of uncharged sex offenses "is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." (*Cordova, supra,* 62 Cal.4th at p. 132.)

When determining whether to admit evidence under Evidence Code section 1108, the trial court must carefully weigh the probative value against the prejudicial effect under Evidence Code section 352. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823.) In examining the admissibility of a prior uncharged sex offense, the court " 'must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission.' " (*Ibid.*)

We have little difficulty in concluding that the trial court in this case did not abuse its discretion in admitting the testimony of Carol B. and Meta K. As shown by their testimony, the circumstances of the uncharged acts were strikingly similar to the charged offense in this

matter. (See *People v. Merriman* (2014) 60 Cal.4th 1, 59 [similarities to charged offenses supported the probative value of the evidence].) In all three instances, appellant, while alone in a private home with the victim, encouraged the victim to accept a mixed drink, using liquor he supplied himself. All three victims fell unconscious shortly after consuming the drinks and came to hours later feeling abnormally confused, more than they would when only drinking alcohol. All three victims had their clothing removed and felt that they had experienced a sexual assault, leading each of them to seek out a sexual assault examination. The commonalities between the charged offense and the prior uncharged acts "permitted the inference that defendant had a propensity to commit such sex offenses, including the charged crime." (*Cordova, supra*, 62 Cal.4th at p. 134.)

Nor were the incidents too remote in time to be probative, as asserted by appellant. The acts involving Carol and Meta occurred approximately 11 to 12 years before the charged offense. This time gap did not compel exclusion of the evidence. (See *Cordova, supra*, 62 Cal.4th at p. 133 [incidents occurring 13 and 18 years prior were admissible].) The trial court properly exercised its discretion in according greater weight to the similarity of the offenses. Moreover, the trial court's consideration of the matter under Evidence Code section 352 dispels appellant's claim that his due process rights were violated by the admission of the evidence. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 [court's exercise of discretion under Evidence Code section 352 obviated due process challenge to Evidence Code section 1108].)

## VI. The *Pitchess* Hearing

The trial court granted appellant's *Pitchess* motion for review of the personnel records of Sergeant Wolfe and Detective Hopkins and conducted an in camera hearing to determine which, if any, of the records were discoverable. At the conclusion of the hearing, the court determined that the personnel files contained no discoverable material.

25

Appellant has requested that this court independently review the sealed records of the *Pitchess* hearing.

We have reviewed the sealed transcript of the proceedings and conclude that the trial court did not abuse its discretion in finding that there were no discoverable records. (*People v. Landry* (2016) 2 Cal.5th 52, 73–74; *People v. Hughes* (2002) 27 Cal.4th 287, 330.)

## VII. Count 1 Must Be Ordered Stayed

Finally, appellant contends that the sentence on count 1, for assault to commit rape during the commission of a first degree burglary, should have been stayed under section 654 instead of being imposed concurrent to count 2, for rape of an intoxicated person. We agree.

At the sentencing hearing, the prosecution argued that count 1 should not be ordered stayed because it involved different conduct from count 2. The trial court concurred in part, but explained its reasoning as follows: "As to count 1, I agree with the People that the court could impose it consecutively. However, given that all three of these charges happened within the same short period of time with the same criminal objective, the court will impose that time to be concurrent with counts 2 and 3." As noted, the trial court ordered the total term of 30 years to life on count 3 stayed under section 654, and imposed a total term of 30 years to life on count 2.

Section 654, subdivision (a), provides, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." In a case involving multiple offenses, " '[i]f all of the offenses were incident to one objective,' " the defendant may be punished for only one offense. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208 (*Latimer*); *People v. Rodriguez* (2009) 47 Cal.4th 501, 507 ["it is well settled that '[s]ection 654 bars multiple punishments for separate offenses arising out of a single occurrence where all of the offenses were incident to one

objective' "].) " ' "The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support [the] finding the defendant formed a separate intent and objective for each offense for which he was sentenced." ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 886 (*Capistrano*), overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

In determining whether to stay the sentence on count 1, the trial court in this matter found that the offense was committed "with the same criminal objective" as counts 2 and 3. Because the court found only a single objective, which was a factual determination supported by substantial evidence, the court was required to conclude that appellant could be punished for only one offense. (See *Latimer, supra,* 5 Cal.4th at p. 1208; *Capistrano, supra,* 59 Cal.4th at p. 886.) Nevertheless, the trial court ordered count 1 to run concurrent to count 2. This sentencing decision was erroneous and must be corrected.

We therefore will modify the judgment to stay the sentence on count 1 in accordance with section 654.[7] (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473 [exercising authority under section 1260 to modify judgment rather than remand as remedy for trial court's failure to impose and stay sentence].)

---

[7] The abstract of judgment issued by the trial court in November 2023 incorrectly listed count 2 as running concurrent to count 1, contrary to the trial court's oral pronouncement of sentence that count 1 would run concurrent to count 2. (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 385 ["Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls"].) Because the disposition of this opinion directs that the abstract of judgment be amended, this clerical error will be eliminated upon remand.

**DISPOSITION**

The judgment is modified to stay the sentence on count 1 under Penal Code section 654. The trial court is directed to prepare an amended abstract of judgment reflecting that a total sentence of 30 years to life (25 years to life plus five years) was imposed on count 2 and that the sentence on count 1 was stayed, and to forward a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


RICHARDSON, J.


GOORVITCH, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.